JOSEPH L. AND ILLAUNA BRAZWELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOSEPH L. BRAZWELL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brazwell v. Commissioner
Docket Nos. 18762-89, 18763-89
United States Tax Court
T.C. Memo 1992-463; 1992 Tax Ct. Memo LEXIS 490; 64 T.C.M. (CCH) 500; August 17, 1992, Filed *490 Decisions will be entered under Rule 155. For Petitioners: James L. Chase. For Respondent: Linda J. Wise
SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax for the years and in the amounts as follows: Joseph L. and Illauna Brazwell - Docket No. 18762-89
Calendar
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(b)(1)
Sec. 6661
1984
$ 261,676
--
$ 133,375
$ 65,359
1985
128,202
--
64,101
32,051
1986
9,156
$ 458 --  2,289
1987
5,224
261 --  1,306
Respondent also determined an addition to tax pursuant to section 6653(b)(2) for 1984 and 1985 and section 6653(a)(1)(B) for 1986 and 1987 equal to 50 percent of the interest due on the deficiency. Joseph L. Brazwell - Docket No. 18763-89
Calendar
Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6653(b)(1)
Sec. 6661
1981
$ 117,427
$ 58,714
--  -- 1982
16,377
--  $ 8,189
$ 4,094
1983
22,717
--  11,359
5,669
For the years 1982 and 1983, respondent also determined an addition to tax pursuant to section 6653(b)(2) [1] equal to 50 percent *491 of the interest due on the deficiency. The issues for decision are: (1) The amount of income for the years 1981, 1982, and 1983 not reported on his Federal income tax returns by Joseph L. Brazwell, and whether Joseph and Illauna Brazwell had unreported income for each of the years 1984, 1985, 1986, and 1987; (2) whether Joseph L. Brazwell is liable for an addition to tax for fraud for each of the years 1984 and 1985; (3) whether Joseph L. and Illauna Brazwell are liable for the additions to tax for negligence and intentional disregard of rules or regulations for the years 1986 and 1987; and (4) whether Joseph L. Brazwell, for the years 1982 and 1983, and Joseph L. and Illauna Brazwell, for the years 1984 through 1987, are liable for the additions to tax for substantial understatement of income tax under section 6661. *492 Joseph L. Brazwell conceded that he is collaterally estopped to deny that he filed false and fraudulent returns for each of the years 1981, 1982, and 1983 with the intent to evade tax and for those years is liable for the additions to tax for fraud. Respondent concedes that Illauna Brazwell is not liable for the additions to tax for fraud for the years 1984 and 1985. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Joseph L. Brazwell and Illauna Brazwell resided in Pensacola, Florida, at the time of the filing of their petition in docket No. 18762-89. Joseph L. Brazwell (petitioner) resided in Pensacola, Florida, at the time of the filing of his petition in docket No. 18763-89. Petitioner was born on March 16, 1941. He left high school after completing his sophomore year and completed high school while serving in the United States Army. At age 17 petitioner married Mary Dale Brazwell. Petitioner and Mary Dale Brazwell had a son, Joseph Lamar Brazwell, Jr., born in 1962. Petitioner and Mary Dale Brazwell were divorced in 1966. Under the terms of the divorce, petitioner assigned his interest in the home to Mary Dale Brazwell and made child *493 support payments until their child finished high school. On November 10, 1968, petitioner married Nina June Brazwell and he and Nina June Brazwell adopted a son, Leighton Brazwell, when Leighton was 3 days old. Leighton was born March 27, 1970. Petitioner and Nina June Brazwell were divorced on June 26, 1974. Petitioner was required to pay attorney's fees and child support. Nina June Brazwell was awarded the family residence. Petitioner and Nina June Brazwell were remarried on May 20, 1975, and again divorced on January 21, 1976. Petitioner continued to support Leighton through the time of the trial of this case. On April 9, 1977, petitioner married Janice Menche. Petitioner and Janice Brazwell were granted a divorce on October 1, 1982. Pursuant to the terms of the property settlement, Janice Brazwell received, among other items, the following: her bedroom suite, consisting of four pieces; her IBM typewriter; a desk and chair; her sewing machine and cabinet; a color television set; all the dining room dishes; and her patio and porch furniture. Petitioner and Janice Brazwell were to divide on an equal basis the linens, kitchen pots and pans, small kitchen appliances, utensils, *494 glasses, knickknacks, pictures, and paintings. On May 24, 1984, petitioner married Illauna Gray. Illauna had attended junior college. On a personal financial statement dated June 30, 1986, petitioner stated that he had household furnishings worth $ 50,000. Petitioner and Illauna Brazwell were still married at the time of trial. Petitioner at some time worked for a Delchamps grocery store. Except for the time he served in the United States Army after being drafted, he worked for MR&R Trucking Co. as a tractor trailer driver and dispatcher from 1965 through part of 1969. In August 1969, petitioner was employed by Gulf Power Co. (Gulf Power). Petitioner worked as a stockhandler in Gulf Power's warehouse shipping and receiving department from the time he was employed until 1971 or 1972. Around 1972, petitioner was transferred to marketing, where he worked in retail sales for the appliance division. In this position petitioner was paid on a commission basis and on this basis made approximately four times the salary he received as a stockhandler. Petitioner worked in the retail sales division until 1978. The minimum salary he earned in this position was approximately $ 20,000 *495 and the maximum ranged from $ 40,000 to $ 50,000. In September 1978, petitioner was promoted to supervisor of the general warehouse. He remained in that position until June 1982. In 1982 petitioner was promoted to supervisor of support services. Support services consisted of the three departments, warehousing distribution, mail distribution, and reproduction copy services. While employed with Gulf Power, petitioner completed several advanced courses in management. Petitioner voluntarily resigned from Gulf Power in February 1984. While employed with Gulf Power, petitioner worked part time with two closely held corporations in which he held the controlling interest, Active Supply Co. and Active Appliance Co. After leaving Gulf Power, he worked with these two companies. During petitioner's employment with Gulf Power, petitioner participated in various schemes, whereby his employer was defrauded. Petitioner received money, materials, and services for his participation in the schemes. An investigation of petitioner's Federal income tax returns for 1981 through 1985 was begun in 1986 by the Criminal Investigation Division of the Internal Revenue Service. On April 6, 1988, a *496 grand jury returned an indictment against petitioner charging him with violating section 7201 by filing false and fraudulent income tax returns for 1981, 1982, and 1983. Under the indictment petitioner was charged with understating his income and income taxes in the following amounts: Understatement of
Year
Income
Taxes
1981
$ 26,200
$ 13,182
1982
77,649
38,438
1983
27,470
12,404
The omitted income set forth in the indictment for each of the years 1981, 1982, and 1983 consisted primarily of amounts petitioner received through embezzlement of money and goods from Gulf Power and the value of services he received from suppliers of Gulf Power. However some of this unreported income was from other sources. On April 7, 1988, petitioner entered guilty pleas to the charges against him for 1981 and 1982. On April 12, 1988, petitioner entered guilty pleas to the charges against him for 1983. In his statement to the Court in connection with his pleas petitioner admitted receiving the unreported income as set forth in the indictment. On June 24, 1988, based on his guilty pleas to the charges in the indictment, petitioner was found guilty of evasion of income taxes *497 under section 7201 for the years 1981, 1982, and 1983. He was sentenced to 3 years' imprisonment for each of the three counts to which he pled guilty, to run consecutively, and fined $ 10,000 for each of the three counts to which he pled guilty. After entering his plea of guilty of income tax evasion for the years 1981, 1982, and 1983, petitioner was called to testify and did testify in a trial involving Richard Leeper which was held June 20 through June 24, 1988. Petitioner testified at that trial that he never participated in a false invoicing scheme involving Gulf Power with Mr. Leeper and John Matthews and denied knowing that the Redco Co., which was owned by Mr. Leeper, or Mr. Leeper, submitted false invoices to Gulf Power. Petitioner filed a motion to have his guilty plea to income tax evasion for the years 1981, 1982, and 1983 set aside, but on the advice of his attorney, who reviewed his testimony before the grand jury, and his testimony at Mr. Leeper's trial, entered into an agreement with the Government to withdraw his motion in return for the Government's agreement not to prosecute him for perjury. Petitioner testified in the instant case that he did participate in *498 schemes to defraud Gulf Power with Mr. Leeper, Mr. Matthews, and the Redco Co. during the years 1981 and 1982 by submitting false invoices to Gulf Power. When the investigation of petitioner's Federal income tax returns for the years 1981 through 1985 was begun in 1986 by the Criminal Investigation Division of the Internal Revenue Service, the case was assigned to Special Agent Sterling. On September 19, 1986, Special Agent Sterling and Special Agent Haywood conducted the initial interview with petitioner. During this interview petitioner stated to the special agents that he had correctly reported his income for the years 1981 through 1983 and for the year 1985, specifically stating that income from all rental properties had been reported on his returns for each of the years 1981 through 1985. He also stated that he had not participated in any schemes to defraud Gulf Power. During the investigation some of petitioner's records, including some canceled checks, were obtained by the agents by means of a summons and were microfilmed. After petitioner's records were returned to him they were in his possession and were brought in by him at the trial of this case. Some alterations *499 were made to some of the checks between the time respondent's special agent had them in 1986 and the time they were offered in evidence at the trial of the instant case. The alterations showed notations on the checks as to the purpose for which the checks were drawn. At the conclusion of petitioner's criminal tax evasion case the investigation of his Federal income tax returns for the years 1981 through 1985 was turned over to Revenue Agent Dandridge, who had previously assisted to some extent the special agent for determination of petitioner's civil tax liability. The returns for the years 1986 and 1987 were added to the investigation undertaken by Revenue Agent Dandridge. Revenue Agent Dandridge turned over all the records he had, including copies of deeds and other property records, to petitioner's representative, and the two of them discussed the case and decided that a net worth reconstruction would be the best method to determine petitioner's income for the years 1981 through 1985, because petitioner's records were not adequate for accurate reconstruction of his income for the years 1981 through 1985. At this time petitioner was incarcerated under the sentence he received *500 for the tax evasion conviction. Petitioner's representative, Mr. Williams, returned the records furnished him by Revenue Agent Dandridge after he had them about 4 months, informing Revenue Agent Dandridge that he had not accomplished anything with respect to the records. Revenue Agent Dandridge made some further investigation and because of the imminent date of expiration of the period of limitations and the unwillingness of petitioner's representative to agree to an extension of more than 60 days, had the statutory notice of deficiency issued on the net worth basis using the information he had available at that time. Petitioner failed to report $ 12,500 of compensation he received in 1985 from Mr. John Cobb and this amount was not reported in either of the later years 1986 or 1987. Petitioner also told the agents that the only stock he ever held was in closely held corporations and Southern Co. though, in fact, during the years here in issue, he owned stock in Ford Motor Co. and in Liberty Holding Co. Petitioner initially told the special agents that he did not have a safe deposit box after 1977 but when he was shown deductions taken in 1981, 1982, and 1983 for the cost of such *501 a box, stated he was mistaken. He stated to the special agents that he had no cash in the box but only papers. Petitioner stated to the special agents that during the years 1980 through 1985 he never had more than $ 150 cash outside of banks at any time. Sometime in the 1970s petitioner purchased unimproved real estate on Millview Avenue in Pensacola, Florida. Petitioner and Nina June Brazwell subsequently borrowed $ 30,000 from Pensacola Home and Savings Association, secured by a mortgage dated October 3, 1975, to construct a home on this property. Around 1976 or 1977 petitioner built a pool on the Millview Avenue property. The Millview Avenue residence was petitioner's primary residence until March 10, 1981. On March 10, 1981, petitioner sold the Millview Avenue residence to Arnold and Debra Easterly for $ 95,000. In part payment of the $ 95,000, the Easterlys assumed petitioner's mortgage on the property to Pensacola Home and Savings Association with a balance of $ 28,427.58 and gave a purchase money mortgage to petitioner in the amount of $ 56,341. The indebtedness under the assumption agreement accrued interest at 8.75 percent per annum and required monthly payments *502 of $ 246.64 beginning April 5, 1981. The indebtedness secured by the purchase money mortgage accrued interest at 12 percent per annum and required monthly payments of $ 593.40. The purchase money mortgage was a second mortgage. With his 1981 income tax return, petitioner filed a Form 2119, Sale or Exchange of Principal Residence. Petitioner stated that the basis of the Millview Avenue residence was $ 85,000 and computed the gain to be postponed as $ 15,500. At the time of sale petitioner's basis in the Millview Avenue residence was $ 39,600. On February 27, 1984, the Easterlys sold the Millview Avenue residence to William and Joyce Ruff. At the time of the sale, the Easterlys were current on their mortgage payments on both mortgages. The Ruffs assumed the indebtedness secured by the mortgage loan from Pensacola Home and Savings Association and assumed the purchase money mortgage held by petitioner. They also gave a mortgage to the Easterlys. The Ruffs made payments on the assumed mortgages for a short period and then defaulted. Petitioner foreclosed on the Millview Avenue residence in 1984. The balance due on the first mortgage note to Pensacola Home and Savings Association *503 at the time of foreclosure was $ 27,000. Petitioner refurbished the property and made current the mortgage to Pensacola Home and Savings Association. As part of the refurbishing, petitioner drained the pool, patched some cracks, reworked the pump, put strainers in the pool, and completely repainted the house. On June 28, 1985, petitioner sold the Millview Avenue residence to M. Reed and Carol Eubanks for $ 95,000. Mr. and Mrs. Eubanks assumed the $ 27,000 mortgage note to Pensacola Home and Savings Association and gave petitioner a mortgage and note for $ 68,000. Mr. and Mrs. Eubanks made timely payments on the mortgages. Shortly before the trial of this case, petitioner sold the mortgage he took from Mr. and Mrs. Eubanks to a mortgage broker. With his 1985 income tax return, petitioner filed a Form 6252, Computation of Installment Sale Income. On this form petitioner stated the basis of the Millview Avenue residence to be $ 84,300 and commissions and expenses of sale to be $ 672. By warranty deed dated November 30, 1977, petitioner's uncle, James G. Brazwell (a.k.a. Jerry Brazwell), and Marie Brazwell conveyed lot 24 in the Lillian Beach subdivision in Baldwin County, Alabama, *504 to petitioner for a stated consideration of $ 2,500. By warranty deed dated September 22, 1978, James Ellis Hudson, Julia Isabel Hudson, Willie Don Hudson, and L. Voncile Hudson conveyed lot 23 of the Lillian Beach subdivision to petitioner. The stated consideration was $ 10 and other good and valuable consideration. By warranty deed dated April 17, 1980, petitioner and Janice Brazwell conveyed lots 23 and 24 of the Lillian Beach subdivision to E. K. Edwards for a stated consideration of $ 30,000. By warranty deed dated April 17, 1980, E. K. Edwards conveyed property at 5011 Muldoon Circle in Pensacola, Florida, to petitioner for a stated consideration of $ 1 and other good and valuable consideration. Petitioner built a residence on the 5011 Muldoon Circle property. Construction began in November 1980 and petitioner occupied the house in February 1981, before the construction was completed. On his 1981 income tax return petitioner reported a basis in the Muldoon Circle residence of $ 96,500. In a financial statement dated in April 1982 petitioner asserted that the Muldoon Circle residence had a fair market value of $ 272,100 and an assessed value of $ 180,000. Petitioner *505 moved from the Muldoon Circle residence in 1983. On his 1984 return, petitioner claimed a deduction for expenses and depreciation for the Muldoon Circle residence on Schedule E. No rent was reported. A deduction for taxes in the amount of $ 1,190 was claimed. Depreciation of $ 21,960 was claimed, based upon the property having a basis of $ 183,000 and being placed in service on January 1, 1984. On May 11, 1985, petitioner sold the Muldoon Circle residence to William E. and Carolyn A. Bassett for $ 216,000. Property taxes through May 11, 1985, were $ 491.26. The sale to the Bassetts was reported on Form 6252, Computation of Installment Sale Income, attached to petitioner's 1985 return. Gain from the sale was computed using a cost basis of $ 183,000, an adjusted basis of $ 161,040, and commissions and expenses of sale of $ 1,761. By agreement dated December 3, 1982, petitioner agreed to purchase 2-1/2 lots with an adjoining 10-foot alleyway described as 10 Pickens Avenue, Pensacola, Florida, from Joy E. McDaniel for $ 50,000. By warranty deed dated December 13, 1982, Ms. McDaniel conveyed the 10 Pickens Avenue property to petitioner. Petitioner's investment in the property *506 as of December 31, 1982, was $ 53,500. At the time of purchase a one-story brick home was located on the 10 Pickens Avenue property. The house was substantially rebuilt and expanded by petitioner. Beginning in 1983, petitioner removed the roof from the house, substantially gutted the existing space and remodeled the house, adding a second story, a garage, a porch, and a fireplace. He rewired the house to be totally electric, replaced appliances, bathroom fixtures, and cabinets in the bathrooms and kitchen, installed new heating and cooling systems, installed a security system, and covered the exterior of the house with cedar. Petitioner also added a pier and boathouse with an electric boat lift and landscaped the property. Some of the materials for the renovation and additions were provided to petitioner at no cost by persons with whom Active Supply Co. did business. The renovation and improvements to the 10 Pickens Avenue residence were made under the general supervision of petitioner. Petitioner had much of the work done by subcontractors. Petitioner had checks, one of which was dated in March 1982, eight of which were dated from January through July 1984, and the remainder *507 from January through December 1983, totaling $ 57,047.36. These checks did not cover many items such as roofing and concrete which were used in the renovation construction. Petitioner purchased appliances at a cost of $ 1,909.85 for the 10 Pickens Avenue residence which were paid for by charges to his electric bill and borrowed some money from Gulf Power to pay for new heating and cooling systems. Respondent in her net worth computation correctly determined the cost of the 10 Pickens Avenue residence at the end of 1983 to be $ 112,261.21, and at the end of 1984 to be $ 139,423.80. Petitioner did not expend any substantial amounts on construction of the 10 Pickens Avenue residence after 1984. In 1980 petitioner owned one lot on Muldoon Road in Pensacola, Florida, which had cost $ 1,500. Petitioner purchased a second lot on Muldoon Road in 1981 for $ 2,200 and retained the lots in 1981 and 1982, giving him a total cost for both lots for both 1981 and 1982 of $ 3,700. In 1983 petitioner sold the lot he purchased in 1981 to Mr. Pope for $ 9,000 and reported the gain on the installment sale method. Petitioner loaned $ 5,000 to Mr. Pope in 1985 which he considered an account receivable. *508 In 1985 petitioner purchased condominium unit 15-C of Tristan Towers in Pensacola for $ 113,019.48, including loan fees and purchase expenses. Petitioner expended $ 10,357.23 in 1985 furnishing and improving the unit and had a cost of $ 123,376.71 in this property at the end of 1985. By warranty deed dated October 30, 1984, Lost Bay Trading Co., Inc., conveyed lot 1 of Cypress Point East in Pensacola to petitioner and Mr. Randy A. Maygarden as tenants-in-common for $ 30,000. On May 15, 1985, petitioner and Mr. Maygarden gave a mortgage on the Cypress Point lot to Citizens & Builders Federal Savings Bank to secure a $ 30,000 loan evidenced by a note, dated the same date as the mortgage, due and payable on July 15, 1985. Petitioner and Mr. Maygarden purchased the lot with the intention of building a speculation home on it and then later selling the property. Mr. Maygarden took over the entire project before the house was built and petitioner had no interest in it. By warranty deed dated June 22, 1984, William T. and Bettye Lou Patton conveyed lot 3, block B, Chantar'ene to petitioner. The stated consideration was $ 10 and other good and valuable consideration. Petitioner paid *509 $ 30,000 for the lot, and there was no mortgage on the lot at the time of purchase. By warranty deed dated August 22, 1984, petitioner conveyed the Chantar'ene property to himself and Mr. Maygarden. The stated consideration was $ 10 and other good and valuable consideration. Mr. Maygarden did not provide any consideration for the interest in the Chantar'ene property conveyed to him by petitioner. Petitioner and Mr. Maygarden intended to build a speculation home on the lot and then sell the property. The proceeds of the sale were to be used first to repay petitioner, and the remainder was to be divided equally between them. Petitioner and Mr. Maygarden arranged for a construction loan to build the speculation home, the money to be received at different phases of the construction. From the proceeds of the loan petitioner was reimbursed $ 14,000 for his expense for the cost of the lot. A speculation home was built and jointly owned by petitioner and Mr. Maygarden. The home was never sold, but was foreclosed on by the bank in 1989. On Schedule E of petitioner's 1987 return, petitioner claimed depreciation on the Chantar'ene property using a basis of $ 81,750. Beginning in 1976, *510 petitioner participated in the Employee Savings Plan (ESP) and Employee Stock Ownership Plan (ESOP) (shown on the net worth computation as Southern Co. stock) of Gulf Power. As of December 31, 1980, petitioner had a basis in the ESP of $ 11,818.58 and a basis in the ESOP of $ 226.10. Petitioner contributed $ 2,926, $ 3,945, and $ 4,384 in 1981, 1982, and 1983, respectively, to the ESP. He contributed $ 558.08, $ 475.42, $ 396.86, and $ 258.66 in 1981, 1982, 1983, and 1984, respectively, to the ESOP. In 1983 petitioner withdrew $ 22,699.50 from the ESP. He received a distribution of all the shares and cash in both plans in 1984. The taxable amount of the distribution was $ 38,751.18. In March 1978 the Bank of Cantonment opened a new branch, and additional stock was offered for sale at that time. As a result of the offering, on March 3, 1978, petitioner acquired 350 shares of stock in the Bank of Cantonment at $ 20 per share. On April 11, 1978, petitioner purchased an additional 150 shares of stock in the Bank of Cantonment from some shareholders. On August 17, 1982, Liberty Holding Co. was formed and petitioner exchanged his Bank of Cantonment stock for stock in Liberty Holding *511 Co. For each share he held in the Bank of Cantonment, petitioner received five shares in Liberty Holding Co. Petitioner received 2,500 shares in Liberty Holding Co. in exchange for his 500 shares in the Bank of Cantonment. Petitioner on his Federal income tax return for 1982 did not report the stock exchange as a taxable transaction. Petitioner sold his stock in Liberty Holding Co. on April 22, 1985, for $ 7 per share, or $ 17,500. No gain or loss from the sale of the Liberty Holding Co. stock was reported on petitioner's 1985 return. Petitioner did not provide information regarding the sale of the Liberty Holding Co. stock to the person who prepared his 1985 income tax return. Beginning approximately in 1976, petitioner had a $ 25 monthly payroll deduction plan for the purpose of purchasing U.S. savings bonds. Petitioner had accumulated not more than $ 1,000 in U.S. savings bonds by the end of 1980. Petitioner continued his $ 25 monthly deduction for U.S. Government bonds as long as he was employed by Gulf Power. Active Supply Co. was formed around September 1982 by petitioner, Mr. Robert Rawson, and Mr. Lee Latina. Mr. Latina sold his stock to the corporation, and it *512 was subsequently purchased by Mr. Edward Gorecki, III, in April 1984. Petitioner owned a 51-percent interest in Active Supply Co. Mr. Gorecki and Mr. Rawson each owned 24-1/2 percent of Active Supply Co. During 1982 and 1983 petitioner contributed a total of $ 38,393.15 to the capital of Active Supply Co. Active Supply Co. was a wholesale plumbing supply company. It had a contract with the Government under which the Government would buy its plumbing supplies from Active Supply Co. on a yearly requirement contract basis. The corporation filed its corporate income tax returns using a fiscal year ending August 31. Active Appliance Co. was formed sometime in 1984. Petitioner owned 51 percent of the stock and Mr. Rawson and Mr. Gorecki each owned 24-1/2 percent. Mr. Gorecki purchased his interest in both Active Supply Co. and Active Appliance Co. for $ 23,000. Active Appliance Co. was an appliance rental company. It had a contract with the Government under which it would lease washers and dryers to the Government for military installations. Sometime in March 1988 petitioner's interest in both Active Supply Co. and Active Appliance Co. was purchased by the corporations. Pursuant *513 to an agreement, petitioner was given a promissory note for $ 500,000. He was paid a downpayment of $ 75,000 and the remainder was to be paid in monthly installments of $ 3,554.94. The promissory note had not been paid in full at the time of the trial. By warranty deed dated March 13, 1979, George S. Carter conveyed lots 24 through 33 of Treasure Hill Park in Pensacola, Florida, to petitioner. The stated consideration was $ 10 and other good and valuable consideration. As consideration for the Treasure Hill lots, petitioner transferred to Mr. Carter $ 4,000 and a 1978 Oldsmobile for which he had paid $ 8,000. Prior to December 31, 1980, petitioner sold two Treasure Hill lots to Mrs. Phelps. In June 1981, petitioner sold the remaining eight Treasure Hill lots to Mr. Edward Joseph Rhodes, Jr., and Mr. George S. Carter. In connection with the June 1981 sale, petitioner took a mortgage note for $ 13,000, with interest at 14 percent from October 1, 1981. The note required quarterly payments of $ 605.67 for 10 years beginning October 1, 1981. Petitioner did not report the sale of the eight Treasure Hill lots to Mr. Rhodes and Mr. Carter on his 1981 return, and did not report any *514 installment payments in subsequent years. Petitioner reported $ 453, $ 1,734, $ 819, and $ 1,512.46 of interest income from Mr. Rhodes on his 1981, 1982, 1983, and 1984 income tax returns, respectively. By warranty deed dated July 19, 1985, Mr. Rhodes conveyed three Treasure Hill lots to Mr. R. Dale Register. The deed does not provide that the conveyance is subject to the mortgage to petitioner or that Mr. Register assumed the debt due petitioner. However, petitioner received payments from Mr. Register and the mortgage was paid off around April 1991. On his 1985 return, petitioner reported seller-financed mortgage interest income of $ 1,377 from Mr. William Register. Based on the $ 1,377 of interest income reported from Mr. Register, respondent's net worth computation shows an accounts receivable item of $ 13,000 which she shows as an accounts receivable as of the end of 1985 on the net worth statement. On October 23, 1984, Harold and Madeline Williams gave a promissory note for $ 12,500, and a mortgage to secure the note (Williams mortgage and note), to Mr. John W. Cobb. The note provided for full payment of the principal on December 1, 1989, with 60 monthly payments of interest *515 in the amount of $ 125 beginning December 1, 1984. Petitioner built an apartment complex for Mr. Cobb sometime around 1983 and 1984. As compensation for petitioner's work on the apartment complex, on October 28, 1985, Mr. Cobb assigned the Williams mortgage and note to petitioner. On his 1985 income tax return, petitioner reported interest income from Campbell in the amount of $ 250. On his 1986 income tax return, petitioner reported interest income from Campbell in the amount of $ 1,500. He reported no interest income from Williams in either year. Around 1979 petitioner made loans to Mr. Gordon Meinscher totaling approximately $ 27,500. At the time of the loan, Mr. Meinscher was married to petitioner's sister, Martha. Mr. Meinscher used the borrowed money to start a Kawasaki/Honda motorcycle dealership in Milton, Florida. Mr. Meinscher was in the motorcycle dealership business from 1976 until 1983. By promissory note dated July 15, 1980, Mr. Meinscher promised to pay petitioner $ 40,000 with interest at the rate of 10 percent per annum. The note required an initial payment of $ 5,000, plus 60 monthly installments of $ 743.65. The promissory note incorporated the $ 27,500 *516 petitioner had already loaned to Mr. Meinscher. The difference in the face amount of the note and the amount of the loan was approximately equal to the amount at which Mr. Meinscher and petitioner valued the motorcycle dealership. The amount of $ 40,000 was a mutually agreed upon figure. Mr. Meinscher and petitioner considered the additional amount included in the promissory note as a return on petitioner's investment. Mr. Meinscher had made no payments on principal or interest with respect to the $ 27,500 loan before he executed the promissory note. Attached to the promissory note was an amortization schedule. The amortization schedule had handwritten notations of when payments were made and indicates that the note was paid off in August 1983. On his 1981 income tax return, petitioner reported interest income of $ 569 from Sunshine Kawasaki and $ 3,053 from Honda of Milton. On his 1982 income tax return, petitioner reported $ 292 of interest income from Sunshine Kawasaki and $ 2,438 of interest income from Honda of Milton. On his 1983 income tax return, petitioner reported $ 819 of interest income from Gordon Meinscher. On his 1984 and 1985 income tax returns, petitioner *517 did not report any interest income from Honda of Milton, Gordon Meinscher, or Sunshine Kawasaki. On May 4, 1979, petitioner purchased through Dean Witter Reynolds, Inc., 750 shares of Southern Co. stock for 12-3/4 per share and on April 3, 1981, sold this stock for 12-3/8 a share. Petitioner told Special Agent Sterling that he had $ 150 cash on hand outside of banks at the end of 1980, 1981, 1982, 1983, 1984, and 1985. On a financial statement dated April 6, 1982, petitioner stated he had cash on hand of approximately $ 9,160. Petitioner and Janice Brazwell were legally married and filed a joint Federal income tax return for the calendar year 1981. Petitioner filed Federal income tax returns for the calendar years 1982 and 1983 using the single filing status. Petitioner and Illauna Brazwell filed joint Federal income tax returns for the calendar years 1984 through 1987. Respondent computed petitioners' income for 1981 through 1985, inclusive, using the net worth plus cash expenditures method. The following schedule shows a net worth statement submitted by the parties with an (A) by the items with respect to which the parties do not disagree: ASSETS
12/31/80
12/31/81
Cash on hand
-0-   -0-   Cash in banks:
Gulf Power Credit Union
$ 1,430.00(A)
$ 16,992.00(A)
Gulf Power Credit Union-Leighton
-0-   -0-   West Florida Bank
867.00(A)
894.00(A)
Bank of Pensacola
-0-(A)
-0-(A)
First State Bank
-0-(A)
-0-(A)
First State Bank-savings
-0-(A)
-0-(A)
Barnett Bank
-0-(A)
3,440.00   Bank of Cantonment
-0-(A)
-0-(A)
Real Estate
Millview Avenue
39,600.00(A)
-0-(A)
5011 Muldoon Circle
30,000.00(A)
96,500.00   10 Pickens Ave.
-0-(A)
-0-(A)
2 lots on Muldoon Rd
1,500.00(A)
3,700.00(A)
Commercial Bldg.-Cervantes
19,000.00(A)
19,000.00(A)
Commercial Bldg.-Cervantes
11,000.00(A)
11,000.00(A)
812 Green Street
-0-(A)
23,821.00(A)
814 Green Street
-0-(A)
23,214.00(A)
923 Scenic Hwy.
-0-(A)
-0-(A)
Woodlands Condo-104 & 204
-0-(A)
-0-(A)
3391 N. Pace St.
-0-(A)
-0-(A)
Tristan Towers Condo
-0-(A)
-0-(A)
Cypress Point Lot
-0-(A)
-0-(A)
Lots 26-32 Treasure Hill
2,000.00(A)
-0-(A)
Accounts Receivable:
Easterly-Millview prop.
-0-(A)
56,040.04(A)
Eubanks-Millview prop.
-0-(A)
-0-(A)
Bassett-5011 Muldoon
-0-(A)
-0-(A)
Pope - 1 of 2 lots on Muldoon
-0-(A)
-0-(A)
Rhodes - Treasure Hill Lots 26 - 32
-0-(A)
12,849.33(A)
Phelphs-Treasure Hill lots 24 & 25
2,500.00(A)
1,850.00(A)
Silvey-Muldoon lot sold in 1980
39,330.67(A)
39,178.94(A)
Williams Mtg ass'd by Cobb
-0-(A)
-0-(A)
Sunshine Kawasaki & Honda
20,683.00   15,381.00   Campbell
-0-(A)
-0-(A)
Register
-0-(A)
-0-(A)
Ruff
-0-(A)
-0-(A)
Retirement/Savings Plans:
IRAs (not in banks included above)
-0-(A)
-0-(A)
Gulf Power Plan
Investments:
Intercapital Liquid Asset
-0-(A)
2,160.00   U.S. Gov'mt Securities
-0-   -0-   Galleria Energy
-0-(A)
-0-(A)
Pensacola Pro Sports
-0-(A)
2,700.00(A)
Liberty Bank
7,000.00(A)
7,000.00(A)
Ford Motor Co. stock
-0-(A)
-0-(A)
Southern Co. stock
-0-   13,380.00   Dean Witter Reynolds
-0-   -0-   Southern Co.
-0-(A)
-0-(A)
Proprietary Interests:
Active Supply Co., Inc.
-0-(A)
-0-(A)
Active Appliance Sales, Inc.
-0-(A)
-0-(A)
Appliance Center of Milton
-0-(A)
-0-(A)
Brazwell-Maygarden
-0-(A)
-0-(A)
Personal Property:
Furniture & Appliances
10,000.00   10,000.00   Autos
24,900.00   24,900.00   Guns/Sports Equipment
4,000.00   4,000.00   Total Assets
213,810.67   388,000.31   *518 ASSETS
12/31/82
12/31/83
Cash on hand
-0-   -0-   Cash in banks:
Gulf Power Credit Union
$ 7,194.00(A)
$ 5,589.00(A)
Gulf Power Credit Union-Leighton
1,586.00   1,741.00   West Florida Bank
-0-(A)
-0-(A)
Bank of Pensacola
-0-(A)
-0-(A)
First State Bank
393.00   1,605.00   First State Bank-savings
-0-(A)
7,160.00   Barnett Bank
-0-(A)
-0-(A)
Bank of Cantonment
-0-(A)
-0-(A)
Real Estate
Millview Avenue
-0-(A)
-0-(A)
5011 Muldoon Circle
96,500.00   96,500.00   10 Pickens Ave.
53,500.00(A)
112,261.21   2 lots on Muldoon Rd
3,700.00(A)
1,500.00(A)
Commercial Bldg.-Cervantes
-0-(A)
-0-(A)
Commercial Bldg.-Cervantes
0-(A)
-0-(A)
812 Green Street
23,821.00(A)
23,821.00(A)
814 Green Street
23,214.00(A)
27,214.00   923 Scenic Hwy.
-0-(A)
40,449.50   Woodlands Condo-104 & 204
-0-(A)
-0-(A)
3391 N. Pace St.
-0-(A)
-0-(A)
Tristan Towers Condo
-0-(A)
-0-(A)
Cypress Point Lot
-0-(A)
-0-(A)
Lots 26-32 Treasure Hill
-0-(A)
-0-(A)
Accounts Receivable:
Easterly-Millview prop.
55,644.06(A)
55,175.32(A)
Eubanks-Millview prop.
-0-(A)
-0-(A)
Bassett-5011 Muldoon
-0-(A)
-0-(A)
Pope - 1 of 2 lots on Muldoon
-0-(A)
8,911.75(A)
Rhodes - Treasure Hill Lots 26 - 32
12,192.04(A)
11,437.78(A)
Phelphs-Treasure Hill lots 24 & 25
1,350.00(A)
1,350.00(A)
Silvey-Muldoon lot sold in 1980
39,007.98(A)
38,815.33(A)
Williams Mtg ass'd by Cobb
-0-(A)
-0-(A)
Sunshine Kawasaki & Honda
9,187.00   -0-   Campbell
-0-(A)
-0-(A)
Register
-0-(A)
-0-(A)
Ruff
-0-(A)
-0-(A)
Retirement/Savings Plans:
IRAs (not in banks included above)
-0-(A)
-0-(A)
Gulf Power Plan
30,165.00   38,530.00   Investments:
Intercapital Liquid Asset
-0-(A)
-0-(A)
U.S. Gov'mt Securities
1,118.00   1,118.00   Galleria Energy
-0-(A)
-0-(A)
Pensacola Pro Sports
-0-(A)
-0-(A)
Liberty Bank
7,000.00(A)
7,000.00(A)
Ford Motor Co. stock
6,000.00(A)
6,000.00(A)
Southern Co. stock
13,380.00   13,380.00   Dean Witter Reynolds
-0-   -0-   Southern Co.
-0-(A)
-0-(A)
Proprietary Interests:
Active Supply Co., Inc.
-0-(A)
38,393.15(A)
Active Appliance Sales, Inc.
-0-(A)
15,500.00   Appliance Center of Milton
-0-(A)
-0-(A)
Brazwell-Maygarden
-0-(A)
-0-(A)
Personal Property:
Furniture & Appliances
24,350.00   24,350.00   Autos
28,016.00   33,164.50   Guns/Sports Equipment
4,400.00   4,400.00   Total Assets
441,718.08   615,366.54   *519 ASSETS
12/31/84
12/31/85
Cash on hand
-0-   -0-   Cash in banks:
Gulf Power Credit Union
$ 8,526.00(A)
$ 19,961.00(A)  Gulf Power Credit Union-Leighton
1,876.00   2,020.00     West Florida Bank
-0-(A)
-0-(A)  Bank of Pensacola
-0-(A)
-0-(A)  First State Bank
899.00   -0-(A)  First State Bank-savings
1,579.00  -0-(A)  Barnett Bank
-0-(A)
-0-(A)  Bank of Cantonment
-0-(A)
-0-(A)  Real Estate
Millview Avenue
-0-(A)
-0-(A)  5011 Muldoon Circle
183,000.00   -0-(A)  10 Pickens Ave.
139,423.80   175,706.98     2 lots on Muldoon Rd
1,500.00(A)
1,500.00(A)  Commercial Bldg.-Cervantes
-0-(A)
-0-(A)  Commercial Bldg.-Cervantes
-0-(A)
-0-(A)  812 Green Street
23,821.00(A)
23,821.00(A)  814 Green Street
28,133.00   28,133.00     923 Scenic Hwy.
40,449.50   40,449.50     Woodlands Condo-104 & 204
-0-(A)
82,000.00(A)  3391 N. Pace St.
-0-(A)
120,000.00(A)  Tristan Towers Condo
-0-(A)
119,935.00     Cypress Point Lot
30,000.00   30,000.00     Lots 26-32 Treasure Hill
-0-(A)
-0-(A)  Accounts Receivable:
Easterly-Millview prop.
55,006.22   -0-(A)  Eubanks-Millview prop.
-0-(A)
67,969.91(A)  Bassett-5011 Muldoon
-0-(A)
210,000.00(A)  Pope - 1 of 2 lots on Muldoon
8,350.38(A)
14,837.92(A)  Rhodes - Treasure Hill Lots 26 - 32
10,572.25(A)
9,579.04     Phelphs-Treasure Hill lots 24 & 25
-0-(A)
-0-(A)  Silvey-Muldoon lot sold in 1980
38,598.35(A)
38,353.63(A)  Williams Mtg ass'd by Cobb
-0-(A)
12,500.00(A)  Sunshine Kawasaki & Honda
-0-   -0-     Campbell
-0-(A)
2,500.00     Register
-0-(A)
13,000.00     Ruff
21,000.00   -0-(A)   Retirement/Savings Plans:
IRAs (not in banks included above)
-0-(A)
2,000.00(A)  Gulf Power Plan
-0-   -0-     Investments:
Intercapital Liquid Asset
-0-(A)
-0-(A)  U.S. Gov'mt Securities
1,118.00   1,118.00     Galleria Energy
16,969.92(A)
132,163.59(A)  Pensacola Pro Sports
-0-(A)
-0-(A)  Liberty Bank
7,000.00(A)
-0-(A)  Ford Motor Co. stock
6,000.00(A)
6,000.00(A)  Southern Co. stock
40,980.00   -0-     Dean Witter Reynolds
-0-   39,800.00     Southern Co.
-0-(A)
-0-(A)  Proprietary Interests:
Active Supply Co., Inc.
306,896.00   306,896.00     Active Appliance Sales, Inc.
15,500.00   15,500.00     Appliance Center of Milton
50.00(A)
50.00(A)  Brazwell-Maygarden
15,000.00(A)
85,000.00(A)  Personal Property:
Furniture & Appliances
37,175.00   50,000.00     Autos
36,000.00   48,500.00     Guns/Sports Equipment
4,400.00   4,400.00     Total Assets
1,079,823.42   1,886,694.57 [sic]
*520 LIABILITIES
12/31/80
12/31/81
Mortgages on Real Estate:
Millview prop.
($ 28,798.52)(A)
-0-(A)
10 Pickens-
First State Bank
Gulf Power C.U.
Bank of Pensacola
-0-(A)
-0-(A)
812 Green Street
-0-(A)
($ 14,680.83)(A)
814 Green Street
-0-(A)
(14,535.62)(A)
923 Scenic Hwy
-0-(A)
-0-(A)
Woodlons Condo - 104 & 204
-0-(A)
-0-(A)
3391 N. Pace
-0-(A)
-0-(A)
Tristan Towers
-0-(A)
-0-(A)
Cypress Point Lot
-0-(A)
-0-(A)
Chantarene (Maygarden)
Barnett Bank - Casimus
(14,000.00)(A)
(14,000.00)(A)
Lot 5-Oakcrest
( 4,769.38)(A)
( 4,565.25)(A)
Notes payable, secured:
C & P Bank - Auto
-0-(A)
-0-(A)
Gulf Power C.U. - Mercedes
-0-(A)
-0-(A)
Deferred Installment Sale
Income:
Millview prop.
-0-(A)
-0-(A)
Muldoon lot - Pope
Muldoon Cir. - Bassett
Depreciation Reserve
( 2,051.75)(A)
Total Liabilities
47,567.90   49,833.46    LIABILITIES
12/31/82
12/31/83
Mortgages on Real Estate:
Millview prop.
-0-(A)
-0-(A)
10 Pickens-
First State Bank
($ 45,000.00(A)
Gulf Power C.U.
( 4,503.20)(A)
Bank of Pensacola
-0-(A)
-0-(A)
812 Green Street
($ 14,330.72)(A)
(13,995.00)(A)
814 Green Street
(14,328.23)(A)
(14,102.51)(A)
923 Scenic Hwy
-0-(A)
(37,424.48)(A)
Woodlons Condo - 104 & 204
-0-(A)
-0-(A)
3391 N. Pace
-0-(A)
-0-(A)
Tristan Towers
-0-(A)
-0-(A)
Cypress Point Lot
-0-(A)
-0-(A)
Chantarene (Maygarden)
Barnett Bank - Casimus
-0-(A)
-0-(A)
Lot 5 - Oakcrest
( 4,349.08)(A)
-0-(A)
Notes payable, secured:
C & P Bank - Auto
-0-(A)
-0-(A)
Gulf Power C.U. - Mercedes
-0-(A)
(28,548.92)(A)
Deferred Installment Sale
Income:
Millview prop.
-0-(A)
-0-(A)
Muldoon lot - Pope
Muldoon Cir. - Bassett
Depreciation Reserve
( 6,565.60)(A)
(13,165.53)(A)
Total Liabilities
39,573.63    156,739.64    *521 LIABILITIES
12/31/84
12/31/85
Mortgages on Real Estate:
Millview prop.
-0-(A)
-0-(A)
10 Pickens-
First State Bank
($ 45,000.00)(A)
-0-(A)
Gulf Power C.U.
( 3,728.27)(A)
( $ 2,801.74)(A)
Bank of Pensacola
-0-(A)
(160,499.00)(A)
812 Green Street
(13,552.74)(A)
( 13,121.07)(A)
814 Green Street
(13,856.84)(A)
( 13,598.45)(A)
923 Scenic Hwy
(37,228.23)(A)
( 37,009.90)(A)
Woodlons Condo - 104 & 204
-0-(A)
( 82,000.00)(A)
3391 N. Pace
-0-(A)
( 98,773.00)(A)
Tristan Towers
-0-(A)
(103,500.00)(A)
Cypress Point Lot
-0-(A)
( 30,000.00)   Chantarene (Maygarden)
( 70,000.00)(A)
Barnett Bank - Casimus
-0-(A)
-0-(A)
Lot 5 - Oakcrest
-0-(A)
-0-(A)
Notes payable, secured:
C & P Bank - Auto
-0-(A)
( 32,000.00)(A)
Gulf Power C.U. - Mercedes
(22,175.46)(A)
-0-(A)
Deferred Installment Sale
Income:
Millview prop.
-0-(A)
( 28,785.00)(A)
Muldoon lot - Pope
(  3,630.00)(A)
Muldoon Cir. - Bassett
( 52,689.00)(A)
Depreciation Reserve
(40,120.47)(A)
( 43,835.04)(A)
Total Liabilities
175,662.01    772.242.20    COMPUTATION OF INCOME
12/31/80
12/31/81
Net Worth
$ 166,242.77
$ 338,166.85   Change in Net Worth
171,924.28   Adjustments:
Additions:
Non-deductible personal
13,388.59(A)
Itemized ded. except med'l
7,664.00(A)
Medical
1,056.90(A)
Property Settlement/Child
Support
1,190.00(A)
Checks to NYCO Security
-0-(A)
Political Contributions
-0-(A)
Paid to Individuals
2,791.87   Payments of Fed'l income tax
Estimated tax
3,200.00(A)
Paid w/return
1,499.83(A)
Withholding
6,068.00(A)
FICA
2,099.84(A)
Add'l assessments
-0-(A)
Technical Adj:
LTCG at 50%
-0-(A)
Total Additions
38,959.03   Reductions:
Tax Refunds
-0-(A)
IRA - contributions
-0-(A)
-earnings
-0-(A)
Section 1202 Deduction
Eastery - underst'mt of gain
Dividend exclusion
(  400.00)(A)
Deferred gain on sale of
residence
(9,500.00)(A)
Form 4972 Recognized income
Total Reductions
(9,900.00)   Adjusted Gross Income
200,983.11   Less: Itemized deductions
( 4,414.00)(A)
Exemptions
( 4,000.00)(A)
TAXABLE INCOME
192,569.11   Reported taxable income
37,887.00(A)
Adjustment
154,682.11   *522 COMPUTATION OF INCOME
12/31/82
12/31/83
Net Worth
$ 402,144.45   $ 458,626.90   Change in Net Worth
63,977.60   56,482.45   Adjustments:
Additions:
Non-deductible personal
9,063.70(A)
17,316.38(A)
Itemized ded. except med'l
9,138.00(A)
8,468.00(A)
Medical
339.00(A)
808.20(A)
Property Settlement/Child
Support
11,630.50(A)
1,020.00(A)
Checks to NYCO Security
72.60   928.90   Political Contributions
30.00(A)
75.00(A)
Paid to Individuals
3,287.29   (included in
basis of
10 Pickens)
5,215.35   Payments of Fed'l income tax
Estimated tax
3,055.00(A)
3,527.00(A)
Paid w/return
-0-(A)
-0-(A)
Withholding
6,557.00(A)
7,644.00(A)
FICA
2,170.80(A)
2,592.80(A)
Add'l assessments
-0-(A)
75.00(A)
Technical Adj:
LTCG at 50%
1,045.00(A)
-0-(A)
Total Additions
51,604.24   42,455.28   Reductions:
Tax Refunds
(  655.00)(A)
(  327.00)(A)
IRA - contributions
(2,000.00)(A)
(2,000.00)(A)
-earnings
(  179.56)(A)
(  459.98)(A)
Section 1202 Deduction
Eastery - underst'mt of gain
Dividend exclusion
(  100.00)(A)
(  100.00)(A)
Deferred gain on sale of
residence
-0-(A)
-0-(A)
Form 4972 Recognized income
Total Reductions
(2,934.56)   (2,886.98)   Adjusted Gross Income
112,647.28   96,050.75   Less: Itemized deductions
( 6,988.00)(A)
(6,168.00)(A)
Exemptions
( 2,000.00)(A)
(2,000.00)(A)
TAXABLE INCOME
103,659.28    87,882.75    Reported taxable income
35,161.00(A)
35,158.00(A)
Adjustment
68,498.28   52,724.75   *523 COMPUTATION OF INCOME
12/31/84
12/31/85
Net Worth
$ 904,161.41     $ 1,114,452.37   Change in Net Worth
445,534.51     210,290.96   Adjustments:
Additions:
Non-deductible personal
28,581.77(A)  47,197.48(A)
Itemized ded. except med'l
13,307.00(A)  13,307.00(A)
Medical
392.45(A)  2,438.63(A)
Property Settlement/Child
Support
2,750.00(A)  3,050.00(A)
Checks to NYCO Security
360.00     270.00   Political Contributions
200.00(A)  400.00(A)
Paid to Individuals
(included in
basis of
10 Pickens)
Payments of Fed'l income tax
Estimated tax
1,600.00(A)  -0-(A)
Paid w/return
-0-(A)  -0-(A)
Withholding
11,642.00(A)  12,896.00(A)
FICA
4,186.03(A)  4,713.28(A)
Add'l assessments
-0-(A)  -0-(A)
Technical Adj:
LTCG at 50%
-0-(A)  -0-(A)
Total Additions
63,019.25     84,272.39   Reductions:
Tax Refunds
(2,788.00)(A)  ( 9,948.00)(A)
IRA - contributions
(2,000.00)(A)  ( 4,000.00)(A)
-earnings
(1,005.14)(A)  ( 1,013.66)(A)
Section 1202 Deduction
(15,239.00)(A)
Eastery - underst'mt of gain
( 5,094.00)(A)
Dividend exclusion
(  200.00)(A)  (   200.00)(A)
Deferred gain on sale of
residence
-0-(A)  -0-(A)
Form 4972 Recognized income
(38,530.00)(A)
Total Reductions
(44,523.14)    (35,494.66)   Adjusted Gross Income
464,030.62     259,068.69   Less: Itemized deductions
(9,907.00)(A)  (45,132.00)(A)
Exemptions
(4,000.00)(A)  ( 4,160.00)(A)
TAXABLE INCOME
450,123.62      209,776.69    Reported taxable income
11,696.00(A)  39,430.00(A)
Adjustment
438,427.62     170,346.69   *524 For the years 1986 and 1987, respondent determined that petitioners failed to report income in the following amounts: Source
1986
1987
Rent from Active Supply Co.
$ 1,400
--  Interest income from Mr. Bassett
1,200
$ 1,471
and failed to report gain from sales of the following properties in the amounts indicated: Property
1986
1987
812 Green Street
$  9,247.70
814 Green Street
7,085.45
923 Scenic Highway
10,300.38
104 and 204 Woodlands
9,330.00
80 percent of Tristan Towers
$  1,817
Renegotiated sale of Muldoon
Circle property
19,450
Respondent also disallowed deductions for depreciation claimed by petitioner of $ 10,577 and $ 2,341 for the years 1986 and 1987, respectively. OPINION The parties agree that the net worth method of computing petitioner's income for the years 1981 through 1985 is proper to use in this case. They agree on the items includable in the net worth statement and in many instances the year and amount at which those items are to be included. A large portion of the net worth statement was agreed to by the parties at the trial and each party has since conceded certain items. We will only discuss those items with respect *525 to which the parties are still in disagreement. Petitioner argues that the cost of the Millview Avenue residence should be increased from the $ 39,600 reflected on the net worth statement as of the end of 1980 to $ 85,000, but gives no explanation for this increase except that he built a pool on the property. The cost of the Millview Avenue residence at the end of 1980 was not one of the items the parties listed as being in dispute. For this reason and also for lack of proof to the contrary by petitioner we conclude that the amount of $ 39,600 was properly used as the cost of the Millview Avenue property at December 31, 1980. The Millview Avenue residence was sold by petitioner in 1981 and the gain on that sale was deferred under section 1034 and therefore that gain does not represent taxable income for 1981. On Form 2119 petitioner computed gain on the sale of the Millview Avenue residence using a basis of $ 85,000. Although the amount of gain deferred is listed by the parties as not in dispute, when the $ 39,600 cost of the Millview Avenue property is deducted from the $ 95,000 sales price less $ 500 commission expense, the result is a gain of $ 54,900 which is deferred in *526 1981. Respondent in the computation attached to her reply brief has apparently made an adjustment in recognition of this adjustment. In any event, the reduction for deferred gain on the sale of a residence in 1981 must be increased from $ 9,500 to $ 54,900. Petitioner makes a number of other arguments with respect to the Millview Avenue property. However since none of the adjustments with respect to this property are shown as being in dispute we have not considered it necessary to discuss these arguments. Petitioner argues that only the cost of the land, $ 30,000, on which the Muldoon Circle residence was built was included in the cost of the Muldoon Circle residence for 1980. He argues that most, if not all, of the construction costs of the residence should have been included in the cost of the residence and that the cost for 1980 should have been $ 96,500. The cost of the Muldoon Circle residence as of the end of 1980 is not one of the items on the net worth statement shown as being in dispute. In any event there is no evidence in the record to support petitioner's position. The $ 96,500 reflected on the net worth statement with respect to the Muldoon Circle residence for *527 1981, 1982, and 1983 is stated to be a contested item. However, there is no evidence in the record to show that the item as determined by respondent is incorrect. Petitioner argues that the cost of the Muldoon Circle residence should not have been reflected on the net worth statement at $ 183,000 in 1984. Petitioner on his income tax returns for 1984 and 1985 used a basis of $ 183,000 for the computation of a depreciation deduction on the Muldoon Circle residence. This is the only evidence in the record to indicate the basis of this property in these years. There is nothing in the record to show that the basis of this property as of the end of 1984 was other than its cost. Respondent argues that based on this statement by petitioner in his returns we should determine the cost of the Muldoon Circle residence to be $ 183,000 at the end of 1984. Since there is nothing to the contrary in the record we hold that the cost of the Muldoon Circle residence at the end of 1984 was $ 183,000. On May 11, 1985, petitioner sold the Muldoon Circle residence to the Bassetts for $ 216,000. The sale to the Bassetts was reported on Form 6252, Computation of Installment Sale Income, attached *528 to petitioner's 1985 return. Gain from the sale was computed using a cost basis of $ 183,000, an adjusted basis of $ 161,040, and commissions and expenses of sale of $ 1,761. The parties are in agreement as to the adjustment for the installment sale of this house in 1985. Petitioner argues that a $ 49,500 liability with respect to the Pickens Avenue residence should be added to the net worth statement as of December 31, 1982. There is no evidence in the record to establish that petitioner had a $ 49,500 liability with respect to the Pickens Avenue residence at the end of 1982. Petitioner argues that in 1983, the cost of the Pickens Avenue residence was approximately $ 118,000. Respondent in the net worth statement determined that the cost at the end of 1983 was $ 112,261.21, and at the end of 1984 was $ 139,423.80, and at the end of 1985 was $ 175,706.98. Because of the many items not accounted for by petitioner in the construction of the house we have accepted respondent's determination of costs as of the end of 1983 and 1984. The evidence does support the conclusion that no substantial expenditures were made on the house in 1985 and therefore its cost remains the same at *529 the end of 1985 as it was at the end of 1984. Some of petitioner's checks for construction of this house were dated in 1984. The record does not show when petitioner received the items to use in construction from suppliers of Active Supply Co. The value of these items should be included in the cost since they would clearly represent income to petitioner and therefore part of the cost of the property in a net worth statement. The record shows work still being done on the property in 1984. Petitioner argues that respondent has treated the 1983 sale of the Muldoon Road lot to Mr. Pope on the net worth statement as a cash sale and not as an installment sale. The net worth statement shows an account receivable to petitioner from Mr. Pope of $ 8,911.75, $ 8,350.38, and $ 14,837.92 at the end of 1983, 1984, and 1985, respectively. It shows a reduction in income at the end of 1985 of $ 3,630 as the deferred installment sale income. Since the sale was made in 1983 a comparable deferred installment sale income adjustment should be shown in prior years. Respondent and petitioner agree as to the original purchase price of the Tristan Towers condominium. The record shows that petitioner *530 expended $ 10,357.23 in 1985 furnishing and improving the unit and that his cost at the end of 1985 was $ 123,376.71. The parties do not agree as to the amount of loan that petitioner received to purchase the Tristan Towers condominium. According to the loan closing statement, petitioner received a loan for $ 103,500. We find that this is the correct amount of the loan to be reflected on the net worth statement for 1985. Petitioner argues that a liability for the purchase of the Cypress Point lot should be recorded on the net worth statement for 1984 and 1985. The liability for 1984 is not indicated as an item in dispute on the net worth statement. Petitioner at trial attempted to establish that the liability with respect to the Cypress Point lot for 1984 was greater than zero. While petitioner and Mr. Maygarden both testified that funds to buy this lot were borrowed in 1984, the only documentary evidence shows the borrowing to be in 1985. Based on the parties' agreement as to the amount of the liability on the property at the end of 1984 and the lack of any reliable evidence to the contrary, we sustain respondent's determination on this item. The liability for 1985 with *531 respect to the Cypress Point lot is correctly reflected on the net worth statement as $ 30,000. Petitioner argues that respondent has not reflected the correct amount of liability with respect to the Chantar'ene property on the net worth statement for 1984 and 1985. Petitioner testified that the construction loan was arranged sometime after August 22, 1984, and was to be drawn on as construction proceeded. Petitioner contends that this loan should be reflected as a liability at the end of 1984 as well as at the end of 1985. Since petitioner has failed to show that any draws were made on this loan in 1984, we sustain respondent's showing of this loan only in 1985. The Chantar'ene property is reflected under proprietary interests in the amount of $ 15,000 and $ 85,000 at the end of 1984 and 1985, respectively. While petitioner made the initial payment on the property of $ 30,000, he was reimbursed $ 14,000. He was liable on the construction loan with Mr. Maygarden. The record does not show when draws were made on the construction loan causing petitioner to become liable for his one-half of that amount of the loan. Petitioner reported a distribution from his Gulf Power retirement *532 plan of $ 38,530 on Form 4972, Special 10-Year Averaging Method, in the year 1984. In 1984 petitioner also received an additional distribution of $ 220.87 from this plan. Petitioner's contributions to the stock plan (ESP) are as follows: 1980
$ 11,818.58
1981
2,926.00
1982
3,945.00
1983
4,384.00
less $ 22,699.50
withdrawn in 1983.
His contributions to the ESOP were as follows: 1980
$ 226.16
1981
558.08
1982
475.42
1983
396.86
1984
258.66
To properly reflect petitioner's taxable income for 1984 and subsequent years an adjustment should be made to account for this income being reported on the basis of 10-year averaging for 1984 and subsequent years. Most of the distribution petitioner received upon termination of his participation in the Gulf Power plan was in stock. The cost of the stock is equal to the sum of the taxable portion from the plan and the already taxed contributions. The cost of the stock from the ESP is $ 28,868.62 composed of $ 28,494.54 of the taxable portion from the plan and $ 374.08 of already taxed contributions. The cost of the stock from the ESOP is $ 12,171.76 composed of $ 220.87 plus $ 10,035.77 taxable portion of *533 the stock distribution from the ESOP plan and $ 1,915.12 of already taxed contributions. On respondent's revised net worth computation petitioner's contributions to the ESP account are shown under the title "Southern Company Stock". On the net worth computation as revised respondent shows the contributions to the ESOP under the title "Gulf Power Plan". Petitioner sold the stock in 1985 for $ 62,321, resulting in capital gain of $ 21,280.62 ($ 62,321 less $ 41,040.38). The section 1202 deduction must be reflected as an adjustment reducing income. Petitioner argues that he acquired 750 shares of Southern Co. stock outside his ESP and ESOP prior to the end of 1979 at an approximate cost of $ 9,562.50. In his requested finding he states that he held this stock through 1985. However, he argues that the opening net worth statement as of the end of the 1980 taxable year should be increased by $ 9,563 and that he sold the stock in 1981. Respondent argues that since petitioner stated in his requested findings of fact that he held the stock through the end of 1985 showing the cost of this stock in the net worth statement neither increases nor decreases the difference in net worth over *534 the period of the computation and has no effect on the understatements of taxable income determined. A brokerage statement received in evidence shows that petitioner purchased 750 shares of Southern Co. stock for $ 9,562.50 on May 4, 1979, and sold it on April 3, 1981, for $ 9,281.25 and that his net worth is increased accordingly as of the end of 1980. Based on this evidence, we conclude these 750 shares of stock were sold on April 3, 1981, for $ 9,281.25. The net worth statement should be adjusted accordingly. The cost of petitioner's Liberty Holding Co. stock was not indicated as an item in dispute. However, petitioner introduced evidence at trial establishing a higher cost of the stock than that reflected on the net worth statement. Petitioner purchased 350 shares of stock in the Bank of Cantonment on March 3, 1978 for $ 7,000. On April 11, 1978, he purchased an additional 150 shares. There is no evidence other than petitioner's testimony that this stock also cost petitioner $ 20 a share. Respondent did not object to petitioner's requested findings of fact that petitioner's cost of the 2,500 shares of Liberty Holding Co. stock, which were received in exchange for 500 *535 shares of Bank of Cantonment stock, was $ 10,000 as of the end of each of the years 1980, 1981, 1982, 1983, and 1984. Based on this apparent concession by respondent and the record, we hold that as of the end of 1980 through 1984 the cost of petitioner's 2,500 shares of Liberty Holding Co. stock was $ 10,000. When petitioner sold his Liberty Holding Co. stock in 1985 for $ 17,500, he realized a gain of $ 7,500, and since this is long-term capital gain petitioner is entitled to the section 1202 deduction in 1985 as a reduction in income on the net worth statement. Accordingly, a reduction adjustment of $ 4,500 should be reflected on the net worth statement for 1985. Petitioner argues that, beginning sometime in the early 1970s, he had a $ 25 monthly payroll deduction plan for the purpose of purchasing U.S. savings bonds and that, as of the end of 1982, he had accumulated $ 1,118 in such bonds. He argues further that, based on the assumption that he had the same amount taken out of his paycheck each year beginning in 1971, he would have averaged $ 86 per year for 13 years ($ 1,118 divided by 13 years). Under this assumption, for the years 1971 to 1980 petitioner would have $ 860 *536 in U.S. savings bonds (10 years multiplied by $ 86 per year). Accordingly, he argues that the opening net worth statement as of the end of 1980 should be increased by $ 860. Respondent does not dispute the $ 1,118 stated on the net worth statement; rather, she argues that if $ 1,118 is used, it should be spread from 1976 to 1982, averaging $ 159.71 per year ($ 1,118 divided by 7 years). She argues that the better evidence is that petitioner had, as he testified, approximately $ 1,000 in bonds at the end of 1980. We find that petitioner had $ 1,000 in bonds at the end of 1980. Deducting $ 25 per month for a year from his salary, petitioner would have accumulated $ 300 cash value in bonds in each of the years 1981, 1982, and 1983. Petitioner left Gulf Power in February 1984 and no longer participated in its bond payroll deduction plan. Accordingly, only $ 25 would have been accumulated in 1984. The parties now agree that petitioner's basis in his Active Supply Co. stock is $ 38,393.15 as of the end of each of the years 1983, 1984, and 1985. Petitioner argues that Active Appliance Co. was not formed until 1984 and that no cost for the company should be reflected on his net worth *537 statement before 1984. Based on the evidence we conclude that Active Appliance Co. was formed in 1984. Accordingly, no cost for Active Appliance Co. stock should be reflected on the net worth statement before the statement of December 31, 1984. The cost of the Treasure Hill lots of $ 2,000 at the end of 1980 was not indicated as an item in dispute on the net worth statement introduced at the trial. However, petitioner introduced evidence at trial without objection by respondent intending to establish a higher cost for these lots than that reflected on the net worth statement. As consideration for the Treasure Hill lots, petitioner transferred to Mr. Carter $ 4,000 and a 1978 Oldsmobile for which he paid $ 8,000. We find that the value of the 1978 Oldsmobile at the time petitioner transferred it to Mr. Carter as consideration for the lots was $ 7,000. Accordingly, the total consideration for the Treasure Hill lots was $ 11,000 and the average cost of each of the 10 lots was $ 1,100. In 1980, when petitioner sold two Treasure Hill lots to Mrs. Phelps for $ 2,500, he realized a gain of $ 300 ($ 2,500 less $ 2,200) and had a cost in the remaining lots of $ 8,800 ($ 11,000 less *538 $ 2,200). As of the end of 1980, the net worth statement should reflect a cost for the Treasure Hill lots of $ 8,800 and a $ 2,500 account receivable from Mrs. Phelps. Prior to October 20, 1980, petitioner would have had to elect to use the installment method to defer gain from an installment sale. See sec. 453(a). Subsequent to October 19, 1980, petitioner would have had to elect not to use the installment method to defer gain. See sec. 453(a), (d). Petitioner argues that he did not elect the installment method for installment sales that he made prior to October 20, 1980. Accordingly, petitioner argues that he should have been taxed on the gain from any such sale in the year in which the sale was consummated. He argues that the sale to Mrs. Phelps is such a sale and that, accordingly, the gain from the sale should not have been deferred into subsequent years. Petitioner has failed to introduce any evidence that the sale to Mrs. Phelps occurred on or before October 20, 1980, or that he did not elect to use the installment method for reporting the gain from the sale. Due to the lack of such evidence, we find that petitioner has not satisfied his burden of proof in establishing *539 that the gain was not to be reported using the installment sale method and, accordingly, we find that the $ 300 of gain from the sale of the two lots to Mrs. Phelps should be reported on the installment method. Petitioner sold the remaining Treasure Hill lots to Mr. Carter and Mr. Rhodes in June 1981 for $ 13,000, realizing a gain of $ 4,200 ($ 13,000 less $ 8,800) from the sale in 1981. Petitioner argues that his cost for the Treasure Hill lots should continue to be reflected on the net worth statement as of the end of the years 1981 through 1985. We do not agree. Petitioner sold his interests in the lots. Accordingly, he no longer has a cost represented in the Treasure Hill lots and they should not continue to appear on the net worth statement as of the end of any year after 1980. Any indebtedness to petitioner from the purchase of these lots or the cash or other assets acquired in the sale would of course appear on the net worth statement. For 1985 the net worth statement shows an accounts receivable entry for the balance due to petitioner from Mr. Rhodes and Mr. Carter. It also shows an accounts receivable entry from a Mr. William Register. The Register entry is based *540 upon an extrapolation from interest income from Mr. Register reported on petitioner's 1985 income tax return. Petitioner argues that the interest was received from Mr. Register because he assumed payments on the three Treasure Hill lots he purchased from Mr. Rhoades and Mr. Carter. He argues that the Register entry represents a duplication of the accounts receivable entry for Mr. Rhodes and Mr. Carter. Petitioner's testimony in this respect is supported by the fact that petitioner's net worth statement lists no other property, as owned by petitioner, from which he could have been receiving seller-financed mortgage interest income from Mr. Register. Although the record is not completely clear, we conclude that the Register accounts receivable entry should be removed from the net worth statement as a duplication of the Rhodes and Carter accounts receivable as of the end of 1985. Petitioner argues that there is a question as to whether he elected to report the gain from the sale of a lot referred to as the Silvey-Muldoon lot on the installment method. He argues that the sale occurred prior to October 20, 1980, and that because he did not elect to report the gain from the sale on *541 the installment method he should have been taxed on the gain only in the year of sale. Petitioner has failed to introduce any evidence that the sale of the Silvey-Muldoon lot occurred on or before October 20, 1980, or that he did not elect to use the installment method for reporting the gain from the sale. Due to the lack of such evidence, we find that petitioner has not satisfied his burden of proof in establishing that the gain was not to be reported using the installment sale method and, accordingly, we find that the accounts receivable entries accurately reflect the sale of the Silvey-Muldoon lot. Respondent argues that petitioner did not report the interest income from the Williams mortgage and note and that a separate note, from which he reported interest income, existed from a Mr. Campbell. Respondent created an accounts receivable entry of $ 2,500 from a Mr. Campbell for 1985 based on an extrapolation from the $ 250 of interest income reported on petitioner's 1985 return. Petitioner argues that the $ 250 of interest reported in 1985 is from the Williams mortgage and note assigned to him by Mr. Cobb. Petitioner testified that he did not know anyone named Campbell or anyone *542 by the name of Campbell who owed him money or would have paid him interest. The amounts reported by petitioner in 1985 and 1986 correlate to the receipt of monthly interest payments in the amount of $ 125 which was the amount payable on the Williams note. Based on the record as a whole, including this fact, we conclude that no separate accounts receivable item from a Mr. Campbell should be included in petitioner's net worth statement as of the end of 1985. Petitioner argues that the net worth statement incorrectly shows no accounts receivable entry in 1980 and an accounts receivable entry in the amount of $ 47,000 in 1981 resulting from the promissory note from Mr. Meinscher to petitioner. We find that the net worth statement does in fact show an accounts receivable entry resulting from the promissory note from Mr. Meinscher for $ 20,683 and $ 15,381 for 1980 and 1981, respectively, labeled as Sunshine Kawasaki & Honda. The note executed on July 15, 1980, required an initial payment of $ 5,000, plus 60 monthly installments of $ 743.65, in payment of principal and interest. This amortization schedule indicates that Mr. Meinscher made the initial $ 5,000 payment and principal *543 payments totaling $ 2,297.90 in 1980. We find that the remaining amount due at the end of 1980 was $ 32,702.10 and the accounts receivable entry for Sunshine Kawasaki & Honda should reflect this amount. The amortization schedule indicates that Mr. Meinscher made principal payments totaling $ 5,920.04 and $ 6,539.96 in 1981 and 1982, respectively. These payments reduced the Sunshine Kawasaki & Honda accounts receivable entry to $ 26,782.06 and $ 20,242.10 in 1981 and 1982, respectively. On brief respondent concedes that these amounts are correct. Petitioner argues that the note was paid off in 1983 and on brief respondent concedes this fact. Petitioner also argues that, because there were two interest payments reflected on his 1981 income tax return, $ 3,053 from Honda of Milton and $ 569 from Sunshine Kawasaki, and because the $ 3,053 interest income correlates to interest payments from the $ 40,000 note, we should find either that a second loan in the amount of $ 5,690 existed from Mr. Meinscher to petitioner or that the one loan was in the amount of $ 47,000. Respondent agrees that a second loan may have existed and suggests that it was in the amount of $ 7,400. There is *544 no evidence that the loan was created before 1981. Accordingly, an additional accounts receivable entry in the amount of $ 7,400 reduced by the amount of principal payments in 1981 and 1982 should be reflected on the net worth statement for 1981 and 1982. The amounts to be reflected are $ 5,507 and $ 3,610 as of the end of 1981 and 1982, respectively. A zero balance should be reflected for all subsequent years with respect to the second loan. Petitioner argues that he had a cash hoard of $ 30,000 to $ 50,000 as of December 31, 1980, that he kept in a safe deposit box and that his cash on hand reflected on the net worth statement for 1980 should be increased by $ 30,000. There is no evidence aside from petitioner's testimony that he had any cash in a safe deposit box during 1980 and in fact he told the special agent that he did not. There is no evidence as to whether or how much cash petitioner may have had during 1980 except his statement to the revenue agent that he never had more than $ 150 in cash at any time during 1980 through 1985. Petitioner did show cash of $ 9,160 on a net worth statement dated April 2, 1982. However, this statement may refer to cash in a checking *545 account. Accordingly, we find that the amount of cash on hand of zero shown on the net worth statement as of the end of each of the years for 1980 through 1985 is correct. There is no reliable evidence in this record of any change in the amount of cash petitioners had on hand at any time during the years here in issue. During 1980, petitioner was married to Janice Menche. On a personal financial statement dated April 6, 1982, petitioner stated that he had furniture worth $ 24,350. Petitioner and Janice were divorced on October 1, 1982. Pursuant to the terms of the property settlement, Janice received her bedroom suite, consisting of four pieces; her IBM typewriter; a desk and chair; her sewing machine and cabinet, a color television set; all the dining room dishes; and her patio and porch furniture. Petitioner and Janice were to divide equally the linens, kitchen pots and pans, and small kitchen appliances, utensils, glasses, knickknacks, pictures, and paintings. On May 24, 1984, petitioner married Illauna Gray. Illauna had been previously married and had a home and furniture of her own. On a personal financial statement dated June 30, 1986, petitioner stated that he had *546 household furnishings worth $ 50,000. Petitioner argues that respondent has overstated the amount of furniture owned by petitioner. Specifically, petitioner points to the fact that in the divorce decree from Janice Menche in 1982, his former wife received only specific items of household furniture. Without so stating petitioner indicates that he might have acquired some furniture after the divorce, but argues that the cost of furniture and fixtures at the end of 1983 should remain constant through the end of 1985. He argues that the furniture the wife he married in 1984 brought into the household should not be shown as an increase in his assets for purposes of the net worth statement. We agree with petitioner on this point. Petitioner states that the financial statement he filed on June 30, 1986, showed the fair market value and not the cost of his furniture. Based on the record, we conclude that the cost of furniture and appliances reflected on the net worth statement for 1983 should also be the amounts reflected for 1984 and 1985. We have discussed all items on the net worth statement with respect to which the parties are not now in agreement. The result shows no increase *547 in net worth in 1985. Respondent argues that the record shows some omitted income in 1985. However, the notice of deficiency and the trial were based on a net worth determination. Respondent did not amend the pleadings to allege any change from the determination in the notice of deficiency. If respondent was going to change the method of determining income, she should have amended her pleading so that petitioner would be on notice of the change. Petitioner reported $ 39,410 of income in 1985. On a net worth basis this reported income was subtracted from the computed increase in net worth and therefore the correctness of the amount was immaterial. If petitioner had been informed that respondent was changing to a specific items basis, he might have attempted to show that some income reported in 1985 should properly be shown in another year. We therefore hold that there is no deficiency in petitioner's income tax for the year 1985. Petitioner failed to introduce any evidence with respect to the adjustments for 1986 and 1987. On brief petitioner argues that he should be allowed to introduce evidence with respect to these items in a Rule 155 computation. Petitioner had his opportunity *548 at the trial to introduce evidence or errors in respondent's determination if such evidence was available to him. His failure to do so cannot be remedied by a further evidentiary hearing. The evidence that is in the record supports the correctness of respondent's determination for 1986 and 1987. We therefore sustain respondent's determinations for these years. Respondent determined an addition to tax pursuant to section 6653(a)(1)(A) and (B) for the years 1986 and 1987. An addition to tax is imposed by section 6653(a)(1)(A) on an underpayment due to negligence or intentional disregard of rules or regulations. The amount of this addition is 5 percent of the underpayment, if any part of the underpayment is attributable to negligence or intentional disregard of rules or regulations. There is an additional amount pursuant to section 6653(a)(1)(B) equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence is defined as a lack of due care or failure to do that which a reasonable and prudent person would do under the circumstances. , affg. . *549 Petitioner has failed to show that any portion of the underpayments in 1986 or 1987 was not due to negligence or intentional disregard of rules or regulations. The understatements of income arose in part from petitioner's failure to provide complete and accurate information to his income tax return preparer and petitioner's failure to correct the omissions after the returns had been prepared but before they were filed. We hold that the imposition of the additions to tax for negligence is proper. Subject to certain exceptions not here applicable, an addition to tax is imposed by section 6661(a) for a substantial understatement of income tax. An understatement is defined as the tax required to be shown on the return less the tax shown on the return, reduced by any rebates. Sec. 6661(b)(2). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). We sustain the addition to tax under section 6661(a) for all years here involved in which a recomputation under Rule 155 shows that the understatement of tax exceeds the 10 percent of tax required to be shown on the return or $ 5,000, whichever *550 is greater. While petitioner concedes the addition to tax pursuant to section 6653(b)(1) and (2) for the years 1981, 1982, and 1983, this addition to tax for 1984 and 1985 as determined by respondent is in issue. Section 6653(b)(1) provides for an addition to tax equal to 50 percent of the underpayment of tax if any part of the underpayment is due to fraud. Section 6653(b)(2) provides for an addition of 50 percent of the interest due on the portion of the underpayment due to fraud. Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); . Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. , affg. ; . Whether fraud exists with respect to a particular tax year is a factual question which must be resolved by an examination of the entire record. , affg. ; *551 . In order to discharge the burden of proving fraud respondent must not only prove that an underpayment exists but must also prove that a part of that underpayment is due to fraud. When fraud is determined for more than 1 taxable year, respondent must show that some part of the underpayment is due to fraud for each taxable year in issue for the addition to tax for fraud to be applicable to each such year. . The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. . The intent to conceal or mislead may be inferred from a pattern of conduct. . A consistent pattern of failing to report substantial amounts of income over a period of several years is persuasive evidence of fraud. See ; , affg. ; ; *552 . However, the mere failure to report income is not sufficient to establish fraud. When the taxpayer's income has been reconstructed by an indirect method of proof, such as the net worth method, a showing by respondent of a likely source of the unreported income is sufficient and it is not incumbent on respondent to disprove nontaxable sources of income other than nontaxable sources specifically brought to respondent's attention as claimed by the taxpayer. . Other badges of fraud which may be taken into account include: The making of false and inconsistent statements to revenue agents, , inadequate records, implausible or inconsistent explanations of behavior, and failure to cooperate with tax authorities, ; . From 1981 to 1984, petitioner consistently failed to report substantial amounts of income. *553 Petitioner also exhibited other badges of fraud. During the course of the investigation, petitioner made statements to the revenue agent and the special agent investigating petitioner's Federal income tax returns which were inconsistent with his testimony in this proceeding. Specifically, petitioner falsely informed the special agent that he had correctly reported his income for the years 1981, 1982, and 1983. During the trial petitioner contended that his illegal activities at Gulf Power concluded in 1982 and did not extend into 1983, even though he had conceded income from these activities in 1983 in connection with his guilty plea to tax evasion in that year. Petitioner stated at one time that he had a cash hoard although he had stated to the special agent that he never had large amounts of cash. Petitioner stated to the special agent that the only stock he owned, outside of that of the closely held corporations, was stock in Southern Co. In fact petitioner owned stock in Ford Motor Co., Delchamps, and Liberty Holding Co. At the perjury trial of Mr. Leeper, an individual who owned a company involved in a scheme to defraud Gulf Power, petitioner's testimony was in conflict *554 with his testimony before the grand jury and in this case. Petitioner's failure to truthfully respond to the inquiries of the agent and special agent also indicate his failure to cooperate with tax authorities. Petitioner maintained inadequate records. His canceled checks and invoices and other records were insufficient from which to compute his income for the years 1981 through 1985 and to establish his expenditures for the Pickens Avenue residence and the Muldoon Circle residence. In the preparation of his Federal income tax returns, petitioner submitted summary sheets to his accountant, often omitting items of income and resulting in the preparation of inaccurate returns. Petitioner also failed to maintain records to show that the Muldoon Circle residence was rented during 1984, if in fact it was, and that the loss claimed on Schedule E was proper. There is also evidence that petitioner altered checks after they had been returned to him by the special agent. Based on respondent's showing of petitioner's consistent pattern of failing to report substantial amounts of income over a period of several years and particularly the large amount underreported in 1984, petitioner's *555 false and inconsistent statements to the revenue agent, special agent, and others, petitioner's inadequate records, and petitioner's failure to cooperate with tax authorities, we find that respondent has established by clear and convincing evidence that petitioner is liable for additions to tax for fraud for 1984 and that the entire understatement of tax for that year is due to fraud. The only basis of respondent's determination of a deficiency for 1985 was increases in net worth. Therefore, there is no deficiency in petitioners' income tax for 1985, and respondent has failed to show fraud for that year. Petitioner on brief claims that he is entitled to compute his income taxes for the years here in issue on the basis of income averaging. Respondent does not argue to the contrary. Therefore, petitioner's income tax for each of the years here in issue should be computed by income averaging if this method is advantageous to petitioner. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩